(C. D. 1521)

TERRAZZO & MARBLE SUPPLY CO., INC. v. UNITED STATES

United States Customs Court, First Division

(Decided April 29, 1953)

Tompkins & Tompkins (Allerton deC. Tompkins of counsel) for the plaintiff.
Charles J. Wagner, Acting Assistant Attorney General (John J. McDermott, Joseph E. Weil, and Mollie Strum, special attorneys), for the defendant.

Before OLIVER and MOLLISON, Judges; MOLLISON, J., concurring

OLIVER, Chief Judge: The merchandise in this case consists of small pieces of colored glass which were classified as articles of colored glass, not specially provided for, under paragraph 218 (f) of the Tariff Act of 1930, and assessed with duty at the rate of 60 per centum ad valorem. They are claimed to be properly dutiable as enamel glass tiles or tiling at the rate of 30 per centum ad valorem under paragraph 231, as modified by the trade agreement with Belgium, T. D. 47600.

Samples of the several items in question are before us (plaintiff's collective exhibits 1 and 2). The parties have agreed that these articles in their imported condition were loose and not glued or attached to any surface as they appear in the exhibits. These small pieces of glass are of various colors, each individual piece being a solid color and measuring approximately one-half inch long, three-eighths of an inch wide, and one-quarter inch thick. Some of the samples (items 195, 201, 202, 204, 207, 209) are composed of a bluish glass base with a silver or gold finish superimposed on the surface. A chemical analysis of these articles was made by the Government analyst and his report is before us (plaintiff's exhibit 3).

The paragraphs involved read, so far as pertinent, as follows:

Paragraph 218 (f) of the Tariff Act of 1930:

* * * all articles of every description not specially provided for, composed wholly or in chief value of glass * * * colored * * * 60 per centum ad valorem.

Paragraph 231, as modified by the trade agreement with Belgium, T. D. 47600:

Opal, enamel, or cylinder glass tiles and tiling, 30 per centum ad valorem.

Several claims are made by plaintiff, the one principally relied on being for classification under the provision in paragraph 231, as modified, supra. Alternative claims are made for classification under paragraph 231 as smalts, not ground or pulverized, at 40 per centum ad valorem, or under the provision in paragraph 230 (d) for "All glass, and manufactures of glass * * * except broken glass or glass waste fit only for remanufacture, not specially provided for, 50 per centum ad valorem," or as nonenumerated manufactured articles

under paragraph 1558, dutiable at the rate of 20 per centum ad valorem. Although counsel for plaintiff at the time of trial stated that none of the claims is abandoned, the proof offered and the argument presented are exclusively directed toward establishing the claim under paragraph 231, as modified, *supra*. We find no reason, therefore, to discuss any of the alternative claims.

Plaintiff concedes that the articles under consideration are composed of glass, but contends that they are more specifically provided for as enamel glass tiles or tiling under paragraph 231, as modified.

All of the evidence before us was introduced by plaintiff. It may be condensed into the following general statement.

Philip J. Fiumara, associated for a period of 25 years in the business of installing terrazzo floors and mosaics on walls and ceilings, as well as doing tile work of all kinds, testified that during the course of his experience he had used ceramic, quarry, and glass tiles for covering floors and ceilings, and that such tiles were principally used for utilitarian purposes, although they also, at times, were decorative. Referring specifically to the merchandise in question (collective exhibits 1 and 2, *supra*), which he characterized as "smalti," he described the use thereof as follows (R. 25):

> We have stuck it on paper, in sections, either plain or in design form, to enhance it decoratively. Then we have attached it to walls and ceilings by means of applying on the wall or the ceiling a coat of what we call scratch, which is made up of sand, cement and water. While that is still wet, we imbed each section into the wall. After a while we remove the paper, and the surface becomes exposed, the tile surface becomes exposed on the wall, or wherever it is applied, wall or ceiling. I may add, with the court's permission that where a decorative feature is included, the pieces of tile have to be cut with a small chisel hammer on a chisel anvil and stuck on paper to carry out the design. It may be no more than Tom Jones' name, or a reproduction of a flower, or a saint.

Illustrations were produced showing usage of the present merchandise in tiling and mosaic work. Some of these were in the form of photographs (collective exhibits 4–A, 4–B, and 4–C), displaying the articles in different phases of mosaic work. A physical exhibit before us (illustrative exhibit 5) shows the articles made into a mosaic in the form of a peacock having a variety of colors and with surrounding ornamental effect, all cemented to a backing and enclosed in a wooden frame. Random use of the merchandise without any particular design but having some variation in color is displayed in a cement background (illustrative exhibit 6). The use of the articles before us, as employed in tiling and mosaic work, was described by the witness as follows (R. 35):

> This type of wall tiling I might say is somewhat more advanced artistically or decoratively than the common ordinary tile with smooth edges, even pieces. The idea in this type is to achieve a decorative effect in a large measure, or in some measure. Roughness is a desirable feature, and the irregularity of the

pieces give you the highlights, and you can get the benefit of the colors from different angles, and the idea in this type of work is to get away from the evenness of joints and make it look more like hand-craft, more artistic.

The witness was questioned at great length in an attempt to show the term or terms by which the articles under consideration are recognized in the trade. His testimony is far from clear. Based upon experience in buying merchandise like the articles before us over a period of 26 years, the witness testified that the term "smalt" is used "a great deal" in connection with collective exhibits 1 and 2, *supra*, that the said merchandise is also referred to as glass enamel, and that it constitutes "enamel, or what we call smalti in Italian, or in English we call it vitreous enamel, glass enamel" (R. 44).

Concerning the term "smalti," the witness testified that he recognized the term in the Italian language to mean "enamels," and in the English language as "enamel tiles." He emphasized that his use of the word has been confined to his business where it originated as an Italian word. On that point, he said (R. 57):

As long as I have been in this business I have known that term "smalti" as meaning Venetian enamel, or vitreous enamel tile, as per Collective Exhibits 1 and 2, in my business. Prior to that I would have said that smalti means enamel, and I would still say today, if it has a double meaning. If you would ask me about it in my trade, I would say that Collective Exhibits 1 and 2, we use the term "smalti" or "smalto", but if you ask me for my knowledge of the Italian language, what it means, I would say it is used as applying to Collective Exhibits 1 and 2, and also as enamel for enameling purposes.

Replying to a question by the court whether there has been a definite term used in buying and selling the merchandise in question, the witness stated: "Sometimes we call it Venetian enamel; sometimes just enamel. The word 'tile' is implied" (R. 58). Upon further questioning along the same line, the witness stated "If I write a letter to the producer in Italy, I just call it smalti."

The articles under consideration are especially desirable for mosaic work by reason of their brilliancy, color, texture, and the irregularity of the pieces that impart a favorable color effect. They cut very readily which is a "very important factor" (R. 83).

On cross-examination, the witness stated that he regarded the terms "enamel glass" and "glass enamels" to be the same thing, that he would refer to the articles in question as either "glass enamel" or "enamel glass," and that his purchases of merchandise as glass enamel tiles were based on what someone told him to be such articles.

It must be clearly understood that the issue before us does not involve either the term "glass enamel" or "enameled glass." The statutory provision under which plaintiff claims is for "enamel" glass. In this connection, the testimony of the witness is not sufficient to show that the merchandise under consideration is composed of enamel glass. Although he attempted to explain how these articles are manu-

factured, he admitted he is not a chemist and does not know what ingredients entered into the manufacture of the merchandise. His statements reveal that he has no direct knowledge with respect to the process of manufacture of enamel glass. His testimony on the point is as follows (R. 65):

X Q. What ingredients go into it that make it enamel glass?—A. I am not a chemist.

X Q. How do you know it is enamel glass?—A. What I have been told and what I have read, and what I was taught.

X Q. What do you understand that goes into glass that makes it enamel glass?—A. Minerals for one. Beyond that I don't know. I am told that they use gold, copper, silver, to get these colors—that and other things, and the process of manufacturing makes it an enamel glass. Beyond that I don't know.

X Q. You don't know what enamel glass is?—A. I know to the extent that I have told you.

Plaintiff's second witness testified that he has been engaged in the mosaic industry for more than 25 years, that his experience has included making designs and installing them, and that for the past 7 years he has supervised mosaic and terrazzo work using articles like those in question. His testimony concerning use of the present merchandise, while substantially the same as that of the previous witness, emphasized the assembly of these articles on paper according to some particular design and installing the collection on walls or ceilings. The principal use of the present merchandise is in mosaic work, defined as "a large pattern or section made up of small pieces, and it can be made of wood, paper, glass, stone, iron; a jigsaw puzzle" (R. 101). Speaking generally of the mosaic industry, the witness stated that it is principally located in New York City, and testified that during all of his experience among mosaic workers the "distinct and well understood term or expression" used by them to designate articles like collective exhibits 1 and 2 has been "smalti, and Venetian enamel, and Venetian enamel glass" (R. 98). On cross-examination, he stated that artisans also refer to articles like collective exhibits 1 and 2, *supra*, as enamel glass tiles and mosaic tiles.

The president of the plaintiff corporation, dealer in and importer of materials associated with tile and mosaic lines, testified that he has been buying and selling articles like collective exhibits 1 and 2 since 1923, which type of merchandise has always originated in Italy. He described its use as follows (R. 104):

Material of this kind has been used historically for walls and floors, store fronts, exposed places, and the like, where the particular qualities of this material, both decoratively, from the standpoint of color and its ability to be meshed into some particular pattern, and its ability to resist the elements, have made it a valuable product.

Referring to his commercial experience, the witness testified that he has bought and sold merchandise like that in question throughout his

28 years of business experience in various parts of the United States, but principally in New York City "where the industry in connection with mosaics is centered," and that during the entire period "the usual appellation" for such merchandise has been "smalti, Venetian glass, enamel glass tiles, glass mosaics. Those were the four principal designations" (R. 110). The witness also stated that the phrase, "enamel glass tiles," has had a distinct meaning in the trade with which he has been familiar ever since he was in the business, and that such phrase "relates specifically to material similar to this card, Collective Exhibits 1 and 2, in various shapes and sizes, used for the same purpose" (R. 106). The witness added that "smalti" refers to merchandise like collective exhibits 1 and 2, and that the articles in question are understood by him to be tiles.

During the course of the trial and in his briefs, counsel for plaintiff has argued to the effect that there is a question of commercial designation involved herein. In the case of *Neuman & Schwiers Co., Inc.* v. *United States*, 24 C. C. P. A. 127 (Customs), T. D. 48606, the Court of Customs and Patent Appeals set forth the rule of commercial designation as follows:

* * * The Supreme Court, * * * as in the noted case of *Two Hundred Chests of Tea*, 9 Wheat. 428, recognized that customs laws were particularly adapted for use by merchants, and that it might well be that commodities which were well known among those who were engaged in the trade, under a certain designation might not be so known, by those who were not engaged in trade; that the Congress was to be understood as speaking in terms of the trade; and that if an article, although not commonly known as designated by the law, was uniformly, definitely, and generally known by that designation in the trade and commerce of the country, it should be included within the statutory term. This rule has been carried down through the years, continuously.

It is also well established that in cases where the principle of commercial designation is invoked, the proof in relation thereto must be directed to the precise statutory language or designation involved, *United States* v. *Armand Schwab & Co., Inc., et al.*, 30 C. C. P. A. (Customs) 72, C. A. D. 218. Furthermore, it must be shown that the statutory phrase or term under consideration had a definite, uniform, and general meaning in the trade and commerce of the United States, as of the time of enactment of the tariff act, which was different from the ordinary common meaning. That proof must then be followed by competent evidence establishing what such commercial meaning was. *Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, T. D. 42641.

On the record before us, plaintiff has not met the requirements to establish a commercial meaning within the cited authorities. Evidently no attempt was made to follow the recognized procedure because counsel in his reply brief states "in this case we do not rely upon this type of commercial designation. We merely ask the court

to give regard to the commercially accepted common meaning of the expression 'enamel glass tiles' because no clearly defined meaning can be found in lexicographical authorities for this expression in its combined form." Plaintiff's proof, as hereinabove outlined, shows that the merchandise in question has been recognized by the witnesses over a long period of years not under a definite, uniform, and general meaning but under several different designations. The four principal ones, as stated by the president of the plaintiff corporation, are "smalti, Venetian glass, enamel glass tiles, glass mosaics." Such a condition will not permit application of the rule of commercial designation.

During the course of the trial, plaintiff suggested a different theory of commercial designation, as disclosed through the following colloquy (R. 48, 49, and 53):

MR. TOMPKINS: It is my understanding that there is a possibility of commercial designation in this case. I don't think there is any question but what the merchandise before the court is a tile, or are tiles. The question arises as to whether they are enamel glass tiles. That is a question that involves possibly a commercial designation if the common meaning for the expression, enamel glass tiles, is different from the commercial meaning.

JUDGE MOLLISON: I want you to point out and show us exactly in the Tariff Act, or in trade agreements, or any other place, what is the exact language that you say has a different meaning as used in the trade and commerce from the common meaning.

MR. TOMPKINS: If you take the word "enamel" alone, you will get a definition which does not seem to correspond with what goes on here. If you take the word "glass" alone, you will get a definition which does not go here, but if you take them in combination, then you get a trade meaning.

JUDGE MOLLISON: I want you to show me in the paragraph of the Tariff Act, and the line and place in the line the words that you say have a different meaning in the trade and commerce from the common meaning. Point it out. You have certain paragraphs involved. Show me the words that you say are involved in the issue of commercial designation. In other words, let's not talk about this thing nebulously.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

MR. TOMPKINS: I might state in our protest we claim under the provision for smalts. We are making the claim under 231 for smalts, but that type of smalts seems to be, from what I can gather from trade sources, different from the merchandise before the court. We are not therefore primarily relying on the tariff provision for smalts. *We do, however, claim that this article is enameled glass known in the trade by reason of its Italian source as smalti, and we further claim that the word "smalti" in the trade is a well understood expression.* [Italics added.]

Arguing along the same line in his brief, counsel for plaintiff states that "the terms 'smalti' and 'enamel' mean one and the same thing," and "since these articles are produced in Italy and are used by Italian mosaic craftsmen in this country, it is only natural that the native Italian word of 'smalti' would be used in the trade in preference to its English equivalent (enamel)." To support the contention, Italian definitions appearing in Italian dictionaries are cited. Such references,

however, are entitled to no consideration in the present discussion. Whatever meaning or connotation a term may have in a foreign country, it has no bearing on the tariff classification of merchandise in this country. (*James F. White & Co., Inc.* v. *United States*, 68 Treas. Dec. 880, T. D. 48061.) In the cited case, the court, in rejecting testimony relating to the commercial meaning of a commodity in the country of exportation, said (p. 884):

It may be that in Scotland polished twist is commercially known as twine and that the trade there does not regard as twine any article of jute that is not polished twist; but if there be any such commercial understanding of the terms "twist" and "twine" in Scotland, that fact could not affect the classification of the involved merchandise upon being imported into the United States. *Masson et al.* v. *United States*, 3 Ct. Cust. Appls. 420, T. D. 33000.

The commercial meaning or commercial recognition of "smalti" in Italy or in the Italian language is immaterial in deciding the present issue.

Considering further plaintiff's attempt to establish classification of the present merchandise under the claim that the term " 'smalti' in the trade is a well understood expression," we find that word to have a common meaning in the English language. Lexicographic authorities show the term as being the plural of "smalto" and set forth definitions as follows:

Webster's New International Dictionary, Second Edition:

smalto, *n.*; *pl.* smalti [It.] Colored glass, or a piece of such, used in mosaic work.

Funk & Wagnalls New Standard Dictionary, 1941 edition:

smalto, *n.* [It.] Colored glass in minute regular squares, used in modern Roman mosaic.

A New English Dictionary (vol. IX, part 1):

Smalto. also *pl.* smalti (8 smalte). [It. * * * of Teutonic origin and related to Smelt *v.* * * *] Colored glass or enamel used for mosaic work, etc.; a small cube or piece of this. 1705 Addison *Italy* 377 Old Roman Mosaic, compos'd of little Pieces of Clay half vitrify'd, and prepar'd at the Glass Houses, which the Italians call *Smalte.* 1859 Gullick & Timbs *Paint.* 80 These *smalti* are vitrified but opaque, partaking of the nature of stone and glass, or enamels. 1880 'Ouida' *Moths* 1. 14 Buttons of repoussé work, or ancient smalto. 1896 *Daily News* 27 Mar. 2/I The work or producing the 'smalto', or choice opaque glass of various colours.

The significance of the foregoing definitions is their consistency in showing that the common or ordinary meaning of the term "smalti," as pieces of colored glass, fits the classification adopted by the collector. Hence, even if it could be said that the articles in question are commercially known, as alleged by plaintiff, as "smalti," a term not used in the tariff act, such fact would not affect its tariff classification when, as we find here, the imported merchandise falls within the common meaning of the tariff provision under which it has been classified.

(*United States* v. *Wilfred Schade & Co.*, 16 Ct. Cust. Appls. 366, T. D. 43092.)

Under circumstances such as are disclosed by the present record, the principle of commercial designation, as judicially interpreted by the cited authorities, has not been established.

The statutory provision for "opal, enamel, or cylinder glass tiles," in paragraph 231, as modified, *supra*, under which plaintiff seeks classification for the present merchandise, has been judicially construed to include only such tiles or tiling as are manufactured of opal glass, *enamel glass*, or cylinder glass. *M. E. Dey & Co., Inc.* v. *United States*, 61 Treas. Dec. 1779, Abstract 20788, and *Hawley & Letzerich* v. *United States*, 52 Treas. Dec. 666, Abstract 4269.

Plaintiff, by its protests, is not only required to show that the collector's classification of the present merchandise, as articles of colored glass, is erroneous, but must also establish the correctness of its claim. As part of its burden to establish classification of the merchandise in question under the provision for enamel glass tiles in paragraph 231, as modified, *supra*, it was incumbent on plaintiff to show that the articles in question are composed of "enamel glass." In this respect, however, the proof is wholly inadequate. Although the president of the plaintiff corporation stated that he visited the factory in Venice, Italy, where the present merchandise was produced, his only testimony concerning the process of manufacture is a statement that the mass of glass is rolled out of the furnace "in what they call a pancake; which is of a definite thickness, and then they go to work and cut this pancake into the size tiles which they wish to have." Such a process might well apply to any type or kind of glass. The record before us is not sufficient to support a finding that the articles in question are composed of enamel glass. This deficiency in proof is fatal to plaintiff's case. The failure of plaintiff to establish that the material of which these articles are made is enamel glass, makes it unnecessary to determine whether the merchandise consists of "tiles" or "tiling," within the provision of paragraph 231, as modified.

The merchandise in question consists of articles of colored glass for which there is no special provision in the statute. They are, therefore, properly classifiable under the provisions in paragraph 218 (f) of the Tariff Act of 1930 for "all articles of every description not specially provided for, composed wholly or in chief value of glass * * * colored * * * 60 per centum ad valorem," as assessed by the collector.

All claims in the protests are overruled and judgment will be rendered accordingly.

CONCURRING OPINION

MOLLISON, Judge: I concur in the conclusion reached by my colleague in this case. As I view the matter, the rule of commercial designation has not been shown to be applicable here for the reason that the only situation in which that rule can function (i. e., where the common meaning of the tariff term is different from the meaning applied to the same in the trade and commerce of the United States) does not appear to obtain herein.

The plaintiff offered testimony by trade witnesses with the obvious purpose of establishing that merchandise such as that at bar, represented by collective exhibits 1 and 2, was known in the trade and commerce of the United States which deals therein under the tariff designation, i. e., "enamel glass tiles and tiling." Under the circumstances of this case, where the rule of commercial designation was not shown to be applicable, such evidence could only be received as bearing upon the common meaning of the term, the presumption being that the common and the commercial meanings were the same, and is received as an aid to the court's understanding of the common meaning of the term.

It must be admitted that there is a dearth of material available to the court outside of the record to aid its understanding of the term "enamel glass tiles and tiling" or the term "enamel glass." However, in a work entitled "Dictionary of the Arts," by Martin L. Wolf (Philosophical Library, New York), the following definition is found of the term "enamel glass":

A fine variety of decorative *glass* that has had a coating of *enamel* applied to its surface during fabrication; the enamel may be white or colored depending upon the degree of *diffusion* desired. Also, glass that has been decorated with *vitrifiable* pigments, or painted according to the techniques of the *enamel method*. * * * [Italics quoted.]

From this it would appear that "enamel glass" is glass which has had the coloring material (enamel) applied to its surface, rather than glass in which the coloring material was introduced while the glass was in the molten state. To this effect is the following in the work entitled "Modern Glass Practice," by Samuel R. Scholes (Industrial Publications, Inc., Chicago, 1935), in the chapter (XVII) entitled "Decorative Processes" and the subheading "Fired Decorations":

* * * Enamels for glass decoration consist of very low-melting glasses: colorless, opaque, or colored, applied in a very finely pulverized form by sprinkling or dusting upon the surface. * * *

There does not appear to be any question but that the glass before us was not produced by the foregoing method, but was produced by the addition of certain minerals or chemicals to the glass in the molten

state.  Plaintiff's witness Fiumara testified on this subject as follows (Tr. pp. 61–62):

CHIEF JUDGE OLIVER:  What is there about these Collective Exhibits 1 and 2 that makes them desirable for use in producing mosaics?

THE WITNESS:  The composition of enamel is straight through the entire piece; irregularity for effect, and the color; the highlights you get from the irregular surface.  It is not enamel on the surface.  It is solid enamel.

CHIEF JUDGE OLIVER:  These Collective Exhibits 1 and 2 are not glass articles with an enamel surface on the top?

THE WITNESS:  That is right.  They are of a vitreous nature; vitreous enamel we call them.

JUDGE MOLLISON:  They are enamel all the way through?

THE WITNESS:  That is right.

CHIEF JUDGE OLIVER:  Is the enamel and the glass mixed?

THE WITNESS:  Yes.

CHIEF JUDGE OLIVER:  Before it is cast?

THE WITNESS:  Yes.  The ingredients that go to make up the so-called enamel stay in the glass right through.  Whatever they are, I don't know.  I am not a chemist.

Later, on cross-examination, the same witness indicated that metals, such as gold, silver, copper, etc., were used, with the addition of "other things" which he apparently was unable to name, "to get these colors."  (Tr. p. 66.)

The method of producing glass described by the witness seems to accord with the descriptions of various authorities as to the method of producing colored glass.  In the work entitled "Get Acquainted With Glass," by C. J. Phillips (Pitman Publishing Corp., New York, 1950), under the heading in chapter 2 of "Special Glasses" (p. 31), the following is said:

Colored glass is produced by the addition of certain metallic oxides to the basic composition.

In the article on "Glass" in volume 10, New International Encyclopaedia (1917), the following statement is made:

Colored glass is made ordinarily like any others, by the addition of dyes (generally metal oxides) to the molten charge.

As pointed out by my colleague, it is possibly revealing that the Italian word "smalto," which appears to be the chief designation by which merchandise such as that before us is known in the trade of the United States which deals therein, has entered the English language with a meaning as "colored glass," rather than under a meaning connoting "enamel," which, according to two of the witnesses, is its direct translation from the Italian language.

It appears to the writer that colored glass and enamel glass are two different things, and that upon this record, at least, it has not been shown that the merchandise in question is composed of enamel glass. I therefore concur in the conclusion reached by my colleague.