(C. D. 607)

NEW YORK MERCHANDISE CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 1, 1942)

*Siegel & Mandell* (*Sidney Mandell* and *Joshua M. Davidson* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on a particular impor-

tation of brass shells. Duty was levied thereon at the rate of 45 per centum ad valorem under paragraph 397 of the Tariff Act of 1930 as manufactures of metal not specially provided for. It is claimed that said articles are properly dutiable at the rate of 35 per centum ad valorem under paragraph 353 of said act as parts of articles suitable for producing or distributing electrical energy, or, alternatively, at the same rate under the same paragraph as parts of articles having as an essential feature an electrical element or device.

This case was originally decided on November 6, 1940, Abstract 44688, and is again before us as the result of a rehearing granted the Government.

At the first hearing, held at New York on October 9, 1939, it was stipulated by and between counsel for the respective parties that the merchandise herein was similar in all material respects to that passed upon by this court in *N. Minami & Co., Inc.* v. *United States*, Abstract 37615, 73 Treas. Dec. 1104.

Samples of the merchandise at bar were admitted in evidence as collective exhibit 1, and a Christmas-tree lighting set, of which the imported article is alleged to form an essential and indispensable part, was admitted in evidence as illustrative exhibit A.

In addition to said exhibits, the plaintiff offered in evidence the testimony of Abraham L. Buschman, who is in charge of the electrical department of the plaintiff-corporation. After identifying the exhibits, he testified in part as follows:

Q. Will you please state how Exhibit 1 is used in connection with Illustrative Exhibit A?—A. The screw shells are set into the insulated material and electric wires lead to each individual brass screw shell, and the wire leads to the next socket or the next outlet and at the end we have an outlet connecting the electric wires to a plug which in turn can be inserted in electric current so as to carry the electricity through the entire string.

Q. What is the function of Collective Exhibit 1 in connection with Illustrative Exhibit A?—A. The function of the brass shell is to distribute the electrical current through any lamp that may be inserted in there.

\* \* \* \* \* \* \*

Q. In other words, if there were seven lights in each one of these seven sockets, by placing the plug into the source of the electric current you would produce light in the seven lamps; is that correct?—A. That's right. But it is not necessary to put a lamp in each of the sockets. If you put a lamp in one socket you would still have a light from that one lamp.

Judge DALLINGER. In other words, you can place a lamp in one socket or in all of them?

The WITNESS. Yes, sir.

By Mr. MANDELL.

\* \* \* \* \* \* \*

Q. Is that the only use to which Collective Exhibit 1 is put that you know?— A. That is the only use I know of. That is the purpose for which we manufacture them.

Q. As far as you know, they have no other use?—A. No.

Q. They are specially designed for that use?—A. They are specially designed for Christmas tree outdoor lighting sets.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. Is Collective Exhibit 1 an integral part of Illustrative Exhibit A?—A. Yes, sir.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. What is the essential feature of Collective Exhibit 1?—A. Being an integral part of that entire unit. The unit cannot function without these brass shells. The brass shells carry the current through the wire.

On cross-examination the witness testified in part as follows:

X Q. What does the word "intermediate" mean in connection with these brass shells?—A. It refers to size.

X Q. Only to size?—A. Only to size.

X Q. The reason you call that an outdoor Christmas tree lighting set is because the wiring is covered with rain resistant or water resistant material, isn't that right?—A. Not only that, but the sockets are pitched as well.

X Q. So the water will not get inside of them?  A. That's right.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

X Q. What is the difference between the intermediate shells and miniature shells?—A. Only the size.

X Q. No other difference?—A. Only in size.

On redirect examination the witness testified in part as follows:

R Q. &ast; &ast; &ast; Can this set that is used for outdoor electric lighting operate with the removal of these female base shells?—A. No, sir.

R Q. The function of Exhibit 1 in Illustrative Exhibit A is not merely as a holder or container for the bulb, is it?—A. No.

R Q. Its function is also to distribute electric current to the lamp, is that correct?—A. It is connected by electric wires so it can distribute the electric current to the lamps.

At the second hearing, held at New York on December 11, 1939, the Government offered in evidence the testimony of T. Jefferey Cook, an electrical contractor, who testified in part as follows:

Q. Now, I show you Plaintiff's Collective Exhibit 1 in the case at bar and ask you if you are familiar with that merchandise?—A. Yes, sir.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. In your experience, is a set of Christmas tree lights like Illustrative Exhibit A the only use to which those sockets are put, the only use to which the female brass shell is put? In other words, is it limited to making Christmas tree lighting sets?—A. No; it could be used for other things.

Q. Could be used in any socket where that sized light is to be used?—A. It could be, yes.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. Now, are you familiar with the smaller shell known as the midget size?—A. It is a candelabra size. That is medium or intermediate; the next size smaller is candelabra, and then miniature.

Q. Are you familiar with miniature?—A. Yes, sir.

Q. In the miniature shells, the Christmas tree lighting sets are put up in series rather than parallel, are they not?—A. The miniature shells are used in series lighting because the current is less than ordinary voltage in the house.

Q. Is there anything about these shells or the miniature shells used in a Christmas tree lighting set which breaks up the electrical current and distributes it to each one of the lamps? * * *—A. In a series set the current is broken up into generally seven or eight bulbs; the bulbs are approximately 14 watts. They are used 14 times 7—makes a total approximate voltage as taken from the base plug.

Q. Do the shells break that up or is it the filament in the lamp?—A. The current is really broken up by the wire that runs between the sockets.

Q. It is the wire, not the shell?—A. Not particularly, no.

Q. Now, in your experience, would you say that Illustrative Exhibit A is an article for distributing electrical energy?—A. I would consider it so in a general electrical sense.

Q. It is more in the nature of an article that utilizes electrical energy, is it not?—A. Yes, sir.

Q. And energy has been completely distributed before this is plugged in?—A. In a house, yes.

## On cross-examination, the witness testified in part as follows:

X Q. * * *. You have the current carried from the main generator to the outlet, You say distribution ends at the outlet. Isn't it possible that there are articles having an electrical element or device which would, after receiving that current from the outlets, distribute and modify it?—A. Certainly, it is possible.

\* \* \* \* \* \* \*

X Q. With reference to articles like Illustrative Exhibit A, that receives the current from the outlet through this socket; is that correct?—A. Right.

X Q. And what does it do with that current?—A. Carries it to sockets.

X Q. Doesn't it distribute it?—A. Not in that; I would say no, it does not.

X Q. Why doesn't it distribute it?—A. Because it distributes to wires.

X Q. Well, it carries a certain amount of current?—A. Certainly.

X Q. Does it carry the same amount of current to each of the sockets?—A. Approximately, yes.

\* \* \* \* \* \* \*

X Q. Without this female brass shell in this article, could you get a light on this article, Illustrative Exhibit A?—A. Yes, sir. If you took that shell out you would get lights in other sockets.

X Q. But not in the one where the shell was out?—A. Yes.

By Judge DALLINGER.

Q. So if all were out you wouldn't get any light?—A. No.

By Mr. MANDELL.

X Q. So the shell is a part of this article necessary to operation?—A. It is essential.

X Q. It is an essential part of this particular article?—A. Yes, sir.

X Q. Does this article operate like an electric sign, an ordinary electric sign you see in the street?—A. Yes, sir.

X Q. It has as an essential feature an electrical element or device? Is that correct?—A. Yes, sir.

## On redirect examination the witness testified in part as follows:

R Q. When you said it was operated like a sign, you meant merely a sign, a light sign that is made by screwing in electric light bulbs? You didn't mean Neon or anything like that, did you?—A. No.

## On recross-examination the witness testified in part as follows:

R. X Q. When you speak of electric signs, they are made by a series of electric bulbs fitting into brass shells, as in Illustrative Exhibit A? The ordinary sign

other than Neon, or other signs, that have circuit breakers, going off and on, is a fixed sign, forming letters by means of the bulbs?—A. Yes; most signs are fixed, not movable or changeable; operates similar to that.

On this record counsel for the plaintiff in their brief filed herein contend that the so-called female brass shells constituting the imported merchandise at bar are properly classifiable under two different classes of merchandise mentioned in paragraph 353, to wit, parts of "articles suitable for producing * * * or distributing electrical energy" and also parts of "articles having as an essential feature an electrical element or device," and in support of their contention counsel cite the decisions in the cases of *German American Import Co.* v. *United States*, T. D. 46488, 63 Treas. Dec. 1130; *N. Minami & Co., Inc.* v. *United States*, Abstract 37615, 73 Treas. Dec. 1104; *N. Minami & Co., Inc.* v. *United States*, C. D. 72, 1 Cust. Ct. 307; and *W. X. Huber Co.* v. *United States*, C. D. 359, 5 Cust. Ct. 1.

In view of the fact that it is stipulated in the instant case that the merchandise is similar in all material respects to that involved in *N. Minami & Co., Inc.* v. *United States*, Abstract 37615, *supra*, and the long line of cases both tried and submitted on stipulation in which this court has held Christmas-tree lighting sets to be properly classifiable under said paragraph 353, we would ordinarily have no hesitancy in deciding the instant case in favor of the plaintiff. Inasmuch, however, as the United States Court of Customs and Patent Appeals in the very recent case of *United States* v. *N. Minami & Co., Inc.*, C. A. D. 188, decided December 29, 1941, has intimated that so-called electrical fixtures including lamps *per se* are not within the purview of paragraph 353, as disclosed by the Congressional history thereof, but are dutiable under paragraph 397 of the Tariff Act of 1930 as manufactures of metal not specially provided for, we fear that all decisions theretofore rendered would no longer be controlling. Nevertheless, we are of the opinion that Christmas-tree lighting sets are articles having as an essential feature an electrical element or device such as signs, as were the Christmas wreaths in the last-cited case. It is a well-known fact that Christmas-tree lighting sets are not used like ordinary fixtures or lamps for illuminating the house, but are solely employed during the Christmas season to decorate Christmas trees both indoors and outdoors. They are more or less symbolical in character of the Christmas season and perform precisely the same function as did the Christmas wreaths involved in the last above-cited case.

Upon all the facts and the law applicable thereto we follow the last-cited decision of the United States Court of Customs and Patent Appeals in *N. Minami & Co., Inc.* v. *United States*, C. A. D. 188, and hold the imported brass shells to be properly dutiable at the rate of 35 per centum ad valorem under said paragraph 353 as parts of articles having as an essential feature an electrical element or device such as

214

signs, as alleged by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.